IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| AMERICAN TRIM, L.L.C. | ) | CASE NO. 3: 99CV7265 |
|  | ) |  |
| *Plaintiff,* | ) | JUDGE JAMES G. CARR |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ORACLE CORPORATION | ) |  |
|  | ) |  |
| *Defendant.* | ) |  |

**BRIEF IN SUPPORT OF
DEFENDANT ORACLE CORPORATION'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Walter J. Rekstis, III (0020877)
James D. Thomas (0039424)
Harris A. Senturia (0062480)
SQUIRE, SANDERS & DEMPSEY L.L.P.
4900 Key Tower
127 Public Square
Cleveland, Ohio  44144-1304
(216) 479-8500

Of Counsel:
Dorian Daley, Esq. (CA 129049)
Oracle Corporation
500 Oracle Parkway, M/S 5op7
Redwood City, CA  94065
(650) 506-0060

Attorneys for Defendant
Oracle Corporation

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................ 2

    A.    The Parties ................................................................................. 3

    B.    American Trim Identifies Its Business Software Needs ................................ 4

        1.    ERP Software ................................................................. 4

        2.    EDI ................................................................................. 6

    C.    American Trim Searches For An ERP Vendor, And Quickly Narrows Its Focus To Oracle ................................................................. 7

    D.    "Oracle Automotive" And The Question Of EDI Functionality ................... 9

        1.    The Statement Of Direction ................................................ 9

        2.    The Oracle Applications User Group ("OAUG") Meeting ................... 12

        3.    The Troy Demonstration ................................................ 13

    E.    American Trim Enters Into The License Agreement With Oracle ................. 15

    F.    Oracle Delivers The Software, And American Trim Accepts It ................... 17

    G.    American Trim Raises Concerns With The Software, And Oracle Attempts To Address Those Concerns ................................................ 20

III.  ARGUMENT ................................................................................. 21

    A.    California Law Governs This Action ................................................ 23

    B.    There Is No Evidence That Oracle Breached The Agreement ................... 24

    C.    There Is No Evidence That Oracle Breached The Express Warranties Set Forth In The Agreement ................................................ 27

    D.    All Implied Warranties Were Disclaimed In The Agreement ................... 27

E.      No Reasonable Juror Could Find That Oracle Intended To Defraud American Trim.................................................................................................................28

F.      American Trim's Recoverable Damages Are Limited To The Fees Paid To Oracle ...........................................................................................................31

    1.      Attorney Fees Are Not Recoverable In This Case .................................31

    2.      American Trim Cannot Meet The Burden For Recovering Punitive Damages.................................................................................................32

    3.      The Limitation Of Liability Clause In The Agreement Is Enforceable ................32

IV.    CONCLUSION............................................................................................ 33

# TABLE OF AUTHORITIES

Page

**Cases**

Anderson v. Liberty Lobby Inc., 477 U.S. 242 (1986) ....................................................32

Banek Inc. v. Yogurt Ventures U.S.A., Inc., 6 F.3d 357 (6th Cir. 1993) ........................24

Bionghi v. Metropolitan Water Dist., 70 Cal. App. 4th 1358 (1999) .............................26

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).........................................................22, 26

Delta Air Lines, Inc. v. Douglas Aircraft Company, Inc., 238 Cal. App.2d 95 (1965)................33

Gray v. Don Miller & Assocs., Inc., 35 Cal.3d 498 (1984) ............................................31

Jarvis v. Ashland Oil, Inc., 17 Ohio St.3d 189, 478 N.E.2d 786 (1985) ........................23

Klaxon Co. v. Stentor Electric Mfg Co., 313 U.S. 487 (1941).......................................23

Lazar v. Superior Court of Los Angeles County, 12 Cal. 4th 631 (1996) ......................28

Marani v. Jackson, 183 Cal. App.3d 695 (Cal. Ct. App. 1986) .....................................26

Markborough California, Inc. v. Superior Court of Riverside County, 227 Cal. App.3d
   705, review denied 1991 Cal. LEXIS 1940 (1991)....................................................33

Myers Bldg. Indus. v. Interface Technology, Inc., 13 Cal. App. 4th 949 (1993)...........32

Palshook v. Jarrett, 120 F.Supp.2d 641 (N.D. Ohio 2000) ...........................................21

Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co., 6 Ohio St.3d 436, 453
   N.E.2d 683 (1983).....................................................................................................23

Tele-Save Merchandising Co. v. Consumers Distributing Co., 814 F.2d 1120 (6th Cir.
   1987) ...................................................................................................................23, 24

**Statutes and Other Authorities**

Ca. Civ. Code § 3294 .....................................................................................................34

Cal. U. Com. Code § 2316 .............................................................................................30

Restatement (Second) of Conflicts of Laws, § 187 ......................................................................25

Restatement (Second) of Conflicts of Laws, § 201 ......................................................................26

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| AMERICAN TRIM, L.L.C. | ) | CASE NO. 3: 99CV7265 |
|  | ) |  |
| *Plaintiff,* | ) | JUDGE JAMES G. CARR |
|  | ) |  |
| v. | ) | **BRIEF IN SUPPORT OF DEFENDANT** |
|  | ) | **ORACLE CORPORATION'S MOTION** |
| ORACLE CORPORATION | ) | **FOR PARTIAL SUMMARY JUDGMENT** |
|  | ) |  |
| *Defendant.* | ) |  |

## I.    <u>INTRODUCTION</u>

Plaintiff American Trim L.L.C. ("American Trim") has brought this action against Oracle Corporation ("Oracle") claiming, principally, that Oracle representatives made fraudulent misstatements about software products that were licensed to Plaintiff pursuant to a written software license agreement between the parties.  After significant discovery conducted by Plaintiff, the record reflects a complete absence of any evidence that any alleged misstatements were made with the intent to deceive American Trim.  In short, this is not a fraud case.

Discovery conducted to date also reflects that there is no evidence that Oracle failed to perform its obligations under the written contract between the parties.  Accordingly, there is no basis for Plaintiff's breach of contract or breach of warranty claims.

At best, viewing the evidence in the light most favorable to the Plaintiff, the only viable claim presented is Plaintiff's claim for negligent misrepresentation.  The crux of this claim is that

American Trim is dissatisfied with its contract because the software licensed to American Trim did not meet American Trim's expectations. More specifically at issue is the justifiability of those expectations, and whether anything that Oracle did, said, or provided caused any harm to American Trim. In short, on this claim the issue is whether American Trim's dissatisfaction is Oracle's fault, or its own fault.

Oracle is confident that it will ultimately prevail on this claim at trial, but recognizes that disposition of the claim at this stage is not warranted under Rule 56. Thus, Oracle does not seek summary judgment on the negligent misrepresentation claim.

However, the undisputed evidence in the record clearly demonstrates that Oracle is entitled to judgment on American Trim's claims of fraud, breach of contract and breach of warranty as a matter of law. There is no evidence that Oracle intended to deceive American Trim about the availability or performance of the licensed software. Further, there is no evidence that Oracle breached the license agreement or the warranties included in the contract. Finally, any implied warranties were effectively excluded under the plain terms of the contract. Accordingly, summary judgment on those claims is the proper vehicle for narrowing the issues for trial.

Specifically, and as fully set forth below, Oracle seeks summary judgment on the following Counts of the Complaint: I (breach of contract), II (breach of express warranties), III (breach of implied warranties), V (fraudulent inducement), and certain damages sought in the Complaint.

## II.   FACTUAL BACKGROUND

The relationship between Oracle and American Trim extended from late 1996 through late 1998. Chronologically, there are four distinct time periods. In the first period, from the end of 1996 through March of 1997, American Trim selected Oracle to provide new business

software to replace all of the business software that was in use at American Trim at the time.  In the second period, in April and May of 1997, American Trim personnel attended demonstrations of Oracle software, and had the opportunity to ask questions about the software's capabilities. During this same period, American Trim representatives also attended a meeting of thousands of users of Oracle software, providing them with the opportunity to meet existing Oracle applications customers and discuss those customers' experiences with Oracle and its software.

The third time period extended from May 1997 through September 1997.  In this time frame, the written agreement between the parties was negotiated and finalized, American Trim representatives had additional opportunities to learn more about Oracle products, and the software was delivered.  Finally, during the period from October 1997 through the end of 1998, Oracle installed the licensed software for American Trim, provided training to American Trim's personnel, and committed a significant amount of time and effort to assist American Trim. However, American Trim made a decision not to move forward with the implementation of Oracle software, attempted to cancel the contract, and ultimately sought a refund of the fees paid to Oracle.

Contrary to what American Trim would like the Court to believe, this is not the story of an unsuspecting, unsophisticated consumer taken advantage of by a deceiving conglomerate. Rather, this is the story of a multi-million dollar arms-length business relationship between two sophisticated corporations, negotiated over a period of several months.

### A.    <u>The Parties</u>

Plaintiff American Trim is a joint venture between Alcoa Inc. (owning 36%) and Superior Metal Products Inc. (owning 64%).  American Trim was formed in 1996 through the combination of Alcoa's Stolle Products subsidiary ("Stolle") and several divisions of Superior Metal Products ("Superior").  (Compl. ¶5; Kasody Dep., 12/22/00 ("Kasody"), at 31).  Two of

the seats on American Trim's Managers' Council (i.e., its board of directors) are occupied by Alcoa representatives, and two are occupied by Superior representatives.  (Hawk Dep. 1/09/01 ("Hawk"), at 16-17).[1]  American Trim is a supplier of components to the automotive and appliance industries, with eighteen plant sites in eight states.  (Hawk at 99).  The company is headquartered in Lima, Ohio, not far from the Stolle plant in Sidney, Ohio.

Defendant Oracle is the world's leading supplier of business software.  Oracle is headquartered in Redwood Shores, California and maintains offices all over the world.  (Compl. ¶2).

## B.   American Trim Identifies Its Business Software Needs

The formation of American Trim brought together two previously separate companies with separate computer systems and separate Information Systems ("I/S") staff.[2]  Shortly after the joint venture was formed, the two separate I/S staffs combined and began planning for the needs of the new company.  Hank Atwell, the senior I/S person at Stolle, was appointed manager of I/S for newly-formed American Trim.  (K. Atwell Dep., 12/08/00 ("K. Atwell"), at 42-45).  One of Atwell's first recommendations was that the entire company should convert to using the same software.  (H. Atwell Dep., 12/12/00 ("H. Atwell"), at 141).

### 1.   ERP Software

The software used by a manufacturing company to address its many varied needs is known as Enterprise Resource Planning ("ERP") software.  (K. Atwell at 75-76).  ERP software consists of numerous software "application" programs designed to perform a variety of tasks,

---

[1] A fifth seat is allocated to Superior, but remains unfilled.  (Hawk at 17).

[2] I/S is also sometimes referred to as "I/T" or "Information Technology."

including financial accounting, human resources, and manufacturing planning functions.[3] (Stratton Dep., 12/12/00 ("Stratton"), at 7-8; K. Atwell at 28; Rogers Dep., 1/10/01 ("Rogers II"), at 58-60).  In discussing what tasks particular software can perform, professionals refer to the software's "functionality."[4]  (K. Atwell at 83-84).

Both before and after the formation of the joint venture, the plants on the Stolle side of American Trim used ERP software from a vendor called "QAD."  On the Superior side, the plants used ERP software from a vendor called "MDSS."(Exh. 1 (RFA) at A01185; Exh. 2 (Strategic Plan) at A01139; H. Atwell at 312-313).  The two ERP systems were incapable of sharing data, and Atwell concluded that both systems were "out-of-date."  (Exh. 1 (RFA) at A01185).

In October of 1996, the American Trim I/S team finalized a "Strategic Planning" document (the "Plan").  The primary strategic objective identified in the Plan was to "Develop a RFA for software and hardware that are required for a totally integrated paperless system for American Trim by 12/31/97."  (Exh. 2 (Strategic Plan) at A01168; H. Atwell at 312-313).  At American Trim, an "RFA" is a Request for Authorization, which is a document that is presented to management in an attempt to obtain approval for significant expenditures.  In fact, at American Trim, an RFA was required for any expenditure in excess of $2,500.  (K. Atwell at 64).

The Plan included a timeline for the development of the RFA, beginning with the task of obtaining "information on various systems" in the fall of 1996.  The planned timeline continued

---

[3] Software application programs, or simply "applications," are sometimes called "application modules" or "modules."  Thus, an ERP suite might include financial modules, human resources modules, and manufacturing modules.  (K. Atwell at 97-98; Rogers II at 58-60).

[4] For example, a word processing application might deliver automatic page numbering functionality and spell checking functionality, among other features.

through the entirety of 1997, culminating with a planned presentation of the RFA to the President of American Trim, Ed Kasody, on December 22, 1997.  (Exh. 2 (Strategic Plan) at A01168).

The length of time American Trim projected that it would take to develop the RFA and select the vendor for the new ERP software was neither surprising nor unusual.  Published reports on which Hank Atwell relied and cited in the RFA indicated that "the ERP selection process can consume up to 20 employees for up to 14 months, with much of the effort spent identifying the key evaluation criteria and collecting data on the alternatives."(Bradley Hecht, *Choose the Right ERP Software,* Datamation, Mar. 1997 (Exh. 7) at 58).[5]

The team understood that the process of bringing the two sides of American Trim to the point of using the same ERP software would require a long-term commitment, and set a goal of five years for accomplishing that task.  (Exh. 2 (Strategic Plan) at A01168; Rogers II at 49-50).

### 2.     EDI

Among the many characteristics that the American Trim I/S team was looking for in ERP software was Electronic Data Interchange ("EDI") functionality.  (Compl. ¶6).  EDI is a means by which companies (typically customers and suppliers) can exchange information (such as orders and shipment status) electronically between different computer systems.  (H. Atwell at 107).

In 1996, the "Big Three" American auto manufacturers – Chrysler, Ford, and General Motors – issued a statement indicating their intention to require their suppliers to communicate via EDI.  (Walczy Dep., 2/04/01 ("Walczy"), at 121-22).  The automakers themselves are referred to in the industry as "OEMs," or "Original Equipment Manufacturers."  The suppliers to the OEMs, such as American Trim, are referred to as Tier 1 suppliers.  The companies that

---

[5] The chart appearing on page A01185 of the RFA is copied from page 58 of the Datamation article.  (Exh. 1; Exh. 7).

supply Tier 1 suppliers are Tier 2 suppliers, and so on.  (Kellenberger Dep., 10/17/00 ("Kellenberger"), at 61-62).

There are codes used to standardize the means of referring to different types of EDI transactions (e.g., an "830" is a "material release" and an "862" is a "shipping schedule").  (Kellenberger at 53).  However, the manner in which these transactions are used by the OEMs is not at all standardized.  (Vandivier Dep., 9/20/00 ("Vandivier"), at 32; H. Atwell at 113-115).  "Each [OEM] has their own set of requirements.  Ford may want their EDI to be interpreted one way and General Motors may have an entirely different understanding of how to implement an 830, for example."  (Pellegrini Dep., 1/05/01 ("Pellegrini"), at 97).  Accordingly, the first application to deal with information transmitted via EDI must "translate" the variety of different information received from different OEMs into a form that is usable by the supplier.  The translated information must then be communicated to other applications in the supplier's ERP suite (for example, an order entry application program).  A similar translation function must be performed (in reverse) for outbound information to be transmitted via EDI.  (Walczy at 20; Kellenberger at 55-56, 110-11).

As part of the new ERP software suite, American Trim sought integrated EDI functionality that would allow American Trim to engage in EDI transactions with its customers, and electronically transmit information between the EDI translator and other appropriate applications within the ERP suite.  (Compl. ¶¶6-8; Rogers Dep., 1/9/01 ("Rogers I") at 39).

C.  **American Trim Searches For An ERP Vendor, And Quickly Narrows Its Focus To Oracle**

In November of 1996, the American Trim I/S team began the search for a new, company-wide ERP system by requesting written information from the "Top 25" ERP systems as rated by the periodical "Manufacturing Systems."  After reviewing the written materials provided in

response to these requests, the I/S team narrowed the choices to six vendors, including Oracle. (Exh. 1 (RFA) at A01194; H. Atwell at 315).

The American Trim I/S team first contacted Oracle in December 1996. Kelly Atwell (Hank Atwell's spouse and a member of the I/S team) contacted Oracle salesman Mike Vandivier seeking general information about Oracle products. Vandivier sent brochures to American Trim and followed up with several sales calls. (Vandivier at 36-38). Oracle sales personnel visited American Trim at the Stolle facility in early 1997. (Compl. ¶11; Vandivier at 39-40).

By mid-March of 1997, American Trim focused its ERP search almost exclusively on Oracle. Oracle's three closest competitors to that point were vendors known as BAAN, SAP, and QAD. (H. Atwell at 160). BAAN was eliminated quickly on the basis that it did not offer the accounting functionality that American Trim sought, and no bid was ever received from BAAN. (H. Atwell at 160). QAD was not invited to bid on a new ERP system, but rather offered a bid that would extend its existing software license on the Stolle side to cover the Superior Metal side of American Trim. It submitted a bid for approximately $750,000 simply to increase the number of users on the existing license without offering any new software or functionality. (H. Atwell at 158-160).

While Hank Atwell and his team were favorably impressed with the demonstration of SAP software, SAP was eliminated from the competition on the basis of cost. SAP submitted two estimates: one for the cost of licensing SAP software and one for the cost of engaging SAP consulting services to install and implement the SAP software. SAP estimated the cost of a software license to American Trim at approximately $1.2 million and the cost of installation and

implementation at approximately $3 million.  (H. Atwell at 154-57; Exh. 3; Exh. 4; K. Atwell at 122-24; Pellegrini at 110; Morgan Dep., 1/11/01 ("Morgan"), at 32).

"Implementation" is the process of installing software products and then choosing among their capabilities in order to make them work in a way that mirrors the customer's actual business processes and addresses all of the customer's business needs.  (Ciccarelli Dep., 10/24/00 ("Ciccarelli"), at 136-37; K. Atwell at 26-28; Rogers I at 23-24).  Businesses frequently engage consulting services to assist them in implementing business software to meet their business processes and needs.  It is not uncommon for the costs of consulting for implementation to range from one to three times the cost of the license of the software to be implemented.  (Exh. 6; Vandivier at 116-18; Ciccarelli at 163-64).  American Trim's I/S team knew from published reports that, for the "top ERP software products . . . the installation and ongoing costs can reach seven to 10 times the initial software cost[.]"  (Bradley Hecht, *Choose the Right ERP Software,* Datamation, Mar. 1997 (Exh. 7) at 58).

American Trim rejected SAP's bid out-of-hand due to the implementation/consulting costs that were part of the SAP bid.  (H. Atwell at 189).  With the search so quickly narrowed to Oracle, Hank Atwell had the final draft of the RFA ready on March 25, 1997 – nine months ahead of schedule.  (Exh. 1 (RFA) at A01184; H. Atwell at 313).

## D.  "Oracle Automotive" And The Question Of EDI Functionality

The dispute between the parties centers on EDI functionality.

### 1.  The Statement Of Direction

On March 12, 1997 – before the American Trim RFA had been finalized – American Trim received a copy of the "Statement of Direction" for "Oracle Automotive."  (Exh. 8;

K. Atwell at 110-11; Rogers I at 41-42).[6]  The Statement of Direction was an Oracle document describing, among other things, Oracle's commitment to development of standard software that would cause information received via EDI to be electronically transmitted into various Oracle ERP application modules.  (Exh. 8).  For ease of reference, this EDI functionality will be referred to hereinafter as "EDI integration."  The software described in the Statement of Direction as addressing this functionality is referred to here as the "standard EDI integration" software.  The standard EDI integration is a subset of the planned functionality of the Oracle Automotive solution[7] described in the Statement of Direction.

As explained on the first page of the Statement of Direction, Oracle Automotive was developed to improve the ability of a range of standard Oracle ERP software applications to meet the needs of suppliers to the automotive industry.  In addition to the dozens of Oracle ERP applications that are listed in the Statement of Direction, Oracle Automotive (as described in the Statement of Direction)

> integrates specialized Automotive EDI and Release Accounting software provided by Radley Corporation.  Radley is Oracle's automotive release accounting partner and adds both industry proven software and years of experience in the constantly evolving automotive industry.  The Radley CARaS system interprets EDI transmissions from the major OEMs and over 150 different supplier partners.  CARaS specializes in extracting/translating EDI content from the OEM to the supplier.

---

[6] The copy that was faxed on March 12, 1997 appears to be missing a few non-critical pages.  However, a complete copy of the Statement of Direction was also produced from American Trim's files.  (Exh. 9).  The difference between the two copies is not material for purposes of summary judgment, as the critical text referenced herein appears in both copies of the Statement of Direction.

[7] A "solution," in software marketing language, is the term for the product or products, or services, or combination of products and services that a vendor offers to meet a customer's business software needs.

(Exh. 8).  The CARaS software is a type of EDI "translator" software, as discussed above.

(Walczy at 20-22; Kellenberger at 110-11).  The Statement of Direction explained that Oracle

Automotive is designed to integrate the CARaS translator with other standard Oracle ERP

applications.

On the bottom of every page of the Statement of Direction, in italics, appeared the

following two sentences:

> *This document is intended for information purposes only.*
> *It is not a commitment to deliver and may not be incorporated into any contract.*

(Emphasis in original)

Furthermore, the final section of the Oracle Automotive Statement of Direction was

entitled "Availability," and read as follows:

> The features listed in this statement of direction are planned for <u>Beta release</u> early
> in calendar Q1 1997 and are based on Oracle Applications Release 10.7 with
> Smartclient.  <u>Production release</u> will be achieved as soon as successful Beta
> testing is completed.

(Exh. 8).  (Emphasis added.)

In the software industry, "Beta" is a common term used to describe a particular stage of

software development.  Software that is in "Beta" is released to a limited number of customers

(called "Beta customers") for purposes of testing and further development, and the software is

not generally available to other customers.  The term "production release," as used in the

Statement of Direction and in the software industry, refers to general availability of the software.

(Vandivier at 25-26); Butts Dep., 10/19/00 ("Butts"), at 39; K. Atwell at 171; Kellenberger at 42-

44; H. Atwell at 277-78; Morgan Dep., 1/11/01 ("Morgan"), at 107; Pellegrini at 53-54; Walczy

at 53).  In short, the Statement of Direction stated that Oracle planned to begin testing the

standard EDI integration software in the first quarter of 1997, and that general availability of the

standard EDI integration would await successful completion of the testing phase.  There was no commitment, projection or estimate in the Statement of Direction as to any date when the testing phase would be complete.

At the time that Hank Atwell finalized the RFA for the new ERP software, the Statement of Direction was the only document American Trim had received from Oracle regarding the functionality and availability of the standard EDI integration software.  The RFA makes no reference to "Oracle Automotive."  (Exh. 1 (RFA) at A01194-96).

## 2.    The Oracle Applications User Group ("OAUG") Meeting

In the middle of April 1997 American Trim I/S team members were invited to and attended an Oracle Applications User Group ("OAUG") meeting in Nashville, Tennessee. (Exh. 10 at A03031; H. Atwell at 241; Stratton at 126).  The OAUG meeting is a regular gathering of thousands of users of Oracle applications.  OAUG meetings are organized and funded by Oracle.  Oracle sponsors these meetings because the meetings provide an opportunity for Oracle applications users to meet, discuss, and compare experiences with Oracle and its software application products.  Although Oracle sponsors the conferences, the OAUG is an organization apart from Oracle itself, with its own board composed entirely of representatives from customers and organizations other than Oracle.  (Stratton at 126-127; H. Atwell at 232, 242; Rogers II at 86-88).

The American Trim attendees at the Nashville OAUG conference were free to seek out representatives of these Oracle customers who were using Oracle software products in the automotive industry, and were free to inquire about and gather information about Oracle Automotive and the status of the Beta testing disclosed in the Statement of Direction. There is no evidence that anyone from American Trim did so.  (H. Atwell at 242-44).

### 3. The Troy Demonstration

On April 24, 1997 – a month after the RFA was finalized – members of the American Trim I/S team attended a demonstration at the Oracle Automotive Solution Center in Troy, Michigan (in the Detroit area). What was said and demonstrated at Troy is a matter of dispute between the parties. However, there is no dispute that the day was almost entirely consumed with the demonstration of standard, generally available applications, including Oracle financial and manufacturing applications and the Radley CARaS EDI translation software. American Trim alleges that the demonstration appeared to show the CARaS software integrated with Oracle ERP applications, and that a statement by Oracle salesman Mike Vandivier at the outset of the demonstration led American Trim attendees to believe that the integration software "was live and in production." (Compl. ¶19(a)).

Mr. Vandivier is the only Oracle or Radley representative alleged by American Trim witnesses to have made any misleading comments about software availability, in that he allegedly told the American Trim attendees that what would be simulated was "live" and in use at customer sites. (H. Atwell at 269-70; K. Atwell at 145-46; Rogers II at 128-29; Pellegrini at 100-101). The record reflects that, if Mr. Vandivier did make such comments, he believed them to be true. (Vandivier at 35, 70).

Indeed, since the very outset of this case, Oracle has admitted that Vandivier may have made broad statements at the demonstration in Troy which he was not qualified to make, but which were made with an honest belief, without intent to deceive, and which were subject to separate inquiry by American Trim. (Answer ¶19) (emphasis added). In fact, there is no evidence that any of the speakers at the Troy demonstration intentionally made any representation that he or she knew to be false.

- 13 -

Furthermore, the undisputed evidence is that none of the American Trim attendees at the Troy demonstration asked a single question about the availability of the EDI integration software described in the Statement of Direction or about the Beta testing disclosed in the Statement of Direction, despite the prominent disclaimers in the Statement of Direction and despite the written disclosure that the Beta testing was not even planned to commence until the first quarter of 1997. (H. Atwell at 267, 280; Walczy at 180).

Indeed, at no time prior to entering into the contract with Oracle in August 1997 did anyone from American Trim make any inquiry about the Oracle Automotive Beta testing, its status, or the availability of the features described in the Statement of Direction.  (H. Atwell at 280).  At no time prior to entering into the contract did anyone from American Trim ask to see, or in fact ever see, the Oracle Automotive software in use at a customer site.  (Rogers II at 113-115; Walczy at 180-81).[8]

American Trim's failures in this regard are particularly notable, given that American Trim President Ed Kasody specifically instructed Hank Atwell to "go to a customer that was using" the Oracle Automotive software.  (Kasody at 58).  Mr. Kasody testified:

> A:  I could just make a comment here that, and if you want to know what transpired there.  I had told Hank, this is something that we do when we buy a press or any major expenditure, we always go and look at the press in operation.  In other words, we will go to a customer facility that has the press and talk to the customer.
>
> I asked Hank to do that and look at a system where Oracle had put in a system.  Go talk to the customers and make sure that everything was what Oracle said it was.  So, I had asked him to do that.

---

[8] Subsequent to the demonstration in Troy, there was no further demonstration of CARaS. American Trim users did attend a two-day session in May 1997 in which a number of the standard Oracle ERP applications were demonstrated.  (Vandivier at 89; H. Atwell at 248).

. . .

A:   When we were getting close to signing the RFA, I asked Hank to go and look at the software system in use.

In other words, I wanted him to go to a customer that was using it. And the reason for that was I wanted to be sure what the customer said. In other words, the salesperson can sell you things that they have or they may not have, but the customer who is using it will normally tell, you know, here's how it's working or not working, here are the problems I have or good things about it.

(Kasody at 56-7, 58).

Neither Hank Atwell nor any other person from American Trim ever asked to "talk to" or "go to" any customer that was using Oracle Automotive in the spring of 1997, or at any time prior to the execution of the contract. (Walczy at 180-81).

### E.   American Trim Enters Into The License Agreement With Oracle

On August 22, 1997 American Trim entered into a Software License and Services Agreement ("SLSA"), a negotiated Amendment to the SLSA, and a Network License Order Form ("Order Form") (collectively, the "Agreement" (Exh. 11)) with Oracle. (H. Atwell at 182). The Order Form contained a list of dozens of programs that were licensed to American Trim. The Agreement called for payment from American Trim to Oracle of $1,263,613 in license fees, $284,734 in technical support fees, and $208,200 in training fees, for a total of $1,756,547. (Exh. 11 (Order Form, SLSA)).

Hank Atwell noted in the RFA that, "Oracle's suggested training and implementation costs approach $1,000,000, and include extensive use of outside consultants." (Exh. 1 (RFA) at A01195). At the time the RFA was finalized, Atwell estimated that the total license fee for the Oracle software would be $1,066,997. (Exh. 1 (RFA) at A01196). Accordingly, the training and implementation costs suggested by Oracle at that time were approximately equal to the cost of

- 15 -

the software.  This ratio was proportionally lower than the 3-to-1 ratio in the SAP bid, but the financial commitment involved was nevertheless quite substantial.

American Trim did not purchase any consulting services to assist in the implementation of the software.  "The I/S Team," wrote Atwell, "feels that $250,000 will cover the training of the in-house Implementation Team, and eliminate the need for the high-priced consultants, thus bringing the expertise inside American Trim."  (Exh. 1 (RFA) at A01195).  Atwell thus convinced his management that American Trim could accomplish for less than one-fourth the cost of the software what Oracle suggested would require a dollar-for-dollar commitment of additional resources.  (Morgan at 52-53).

The events occurring within American Trim between the finalization of the RFA in March 1997 and the execution of the Agreement in August are somewhat mysterious.  Either American Trim did not make any pre-transaction written record of the approval of this multi-million dollar transaction, or American Trim destroyed all of the pre-transaction written records reflecting approval of the transaction.  The only internal American Trim document produced by American Trim reflecting some official action with respect to this transaction is the March 1997 RFA, and that document bears only the signature of its preparer, Hank Atwell.  Even the resolution of American Trim's Managers' Council approving the transaction is dated October 31, 1997 – over two months <u>after</u> Dana Morgan, the Treasurer of American Trim, executed the Agreement.  (Exh. 1 (RFA) at A01184; Exh. 12 (Resolution); Exh. 11 (Agreement)).

What is clear is that American Trim had the benefit of outside legal counsel and the opportunity to carefully review the Agreement before entering into it.  A copy of the form of the SLSA was first provided to American Trim On April 15, 1997 – four months before the execution of the Agreement – expressly "so that you [American Trim] and your legal counsel

- 16 -

can review them prior to entering into any contractual negotiations with Oracle Corporation." (Exh. 13). It is apparent that American Trim took advantage of this opportunity because it negotiated an Amendment to the SLSA to eliminate a venue selection clause at § 7.3 of the SLSA. (Exh. 11 (Agreement) at A00494; Exh. 5; H. Atwell at 175-76).

The Order Form, as executed, contained a line item marked "Oracle Automotive CARaS." Exh. 11 (Agreement) at A00483. In prior drafts of the agreement, and on the pricing worksheet that was used to negotiate the final amount of license fees, the same line item appears as "Radley CARaS." (Exh. 14; Exh. 15). There is no difference between "Radley CARaS" and "Oracle Automotive CARaS." They are simply different marketing terms for the CARaS EDI communication and translation software developed by Radley. (Vandivier at 98-99; Kellenberger at 94-95; Walczy at 138, 175-77).

### F.    Oracle Delivers The Software, And American Trim Accepts It

On August 24, 1997 Oracle delivered the licensed software to American Trim. However, American Trim (for business reasons) did not wish to accept delivery of the software on that date. Hank Atwell and Mike Vandivier worked out an arrangement pursuant to which Vandivier took possession of the delivered materials, and then re-delivered them to American Trim in September of 1997. (Vandivier at 102-4; Exh. 16).

Between the initial delivery and re-delivery of the software, American Trim I/S team members attended another OAUG meeting in Orlando, Florida. (H. Atwell at 289; Rogers II at 85-86; Exh. 16). One of the break-out sessions on the agenda for the Orlando OAUG meeting was entitled "Automotive Process SIG,"[9] and was to provide "an update regarding the Oracle Automotive solution status." (Exh. 17 at A03090). The presenter for this session was identified

_____

[9] "SIG" stands for "Special Interest Group." (OAUG Orlando Agenda (Exh. 17) at A03079; Rogers I at 77-78).

as an employee of Alcoa Fujikura Ltd., a majority-owned Alcoa subsidiary which had also licensed Oracle's ERP applications and Radley's CARaS software.  (Exh. 17 at A03090; www.alcoafujikura.com; Exh. 18).  However, none of the American Trim attendees at the Orlando OAUG meeting inquired about or gathered any information regarding Oracle Automotive.  (H. Atwell at 289).  This failure is particularly notable given Ed Kasody's express instructions to Hank Atwell to seek out and speak with other Oracle customers.

In conjunction with the Orlando OAUG meeting, Oracle issued public press releases indicating that Oracle Automotive was to become generally available with "Oracle Applications Release 11" (Exh. 19), which in turn was not due for general release until some time in 1998 (Exh. 20).

On the re-delivery of the software in September 1997, American Trim had the opportunity to examine what was delivered, to raise any questions about what was delivered, and even to cancel any (or all) of the licenses.  The Order Form provides that, for each program licensed, the customer has an "Acceptance Period" of fifteen days following the date of delivery.  During that period, the customer is free to cancel any of the licenses granted simply by giving written notice to Oracle, refraining from using the software, and returning or destroying applicable materials.  (Exh. 11 at A00485; Vandivier at 103-4).

When the software was re-delivered in September, American Trim I/S personnel went through the delivered materials to determine whether all of the licensed software had been delivered.  (K. Atwell at 167-70).

In the delivery, American Trim received a CD-ROM contained in a "jacket" marked "Oracle Applications," with the phrase "Release 10.7" immediately following.  (Exh. 21 at

- 18 -

A01176).  The CD jacket lists a variety of Oracle applications delivered on the CD (which has a standard Part Number).  Some of the listed applications were licensed to American Trim via the Order Form, and some of them were not.  For example, American Trim did not license "Oracle Government Purchasing," which is one of the applications listed on the CD jacket.  (Pellegrini at 127-29).  Pursuant to the SLSA, American Trim had agreed that it would not use any programs not specified on the Order Form, and that it had "no right to use any other software program that may be delivered with ordered Programs."  (Exh. 11 (SLSA) at ¶2.1(A)).

One of the applications listed on the CD jacket is "Oracle Automotive."  Alongside the entry for Oracle Automotive the word "Beta" is clearly marked.  (Exh. 21 at A01179).  American Trim knew that it was not a Beta customer for Oracle Automotive, and did not believe that it had licensed any Beta software.  (H. Atwell at 278; K. Atwell at 170-71; Morgan at 107).  American Trim was never a Beta customer for Oracle Automotive.  (H. Atwell at 278; Kellenberger at 42-43).

The CARaS software was shipped separately, directly from Radley, under a separate bill of lading.  Neither the Radley bill of lading nor the packing slip that accompanied the Oracle shipment anywhere lists "Oracle Automotive" as a product delivered to American Trim.  (Exh. 22 (Bill of Lading); Exh. 23 (Packing Slip); Walczy at 139-40).

Significantly, American Trim did not receive with the delivery any user guide or installation manual indicating that the delivered software would provide the integrated EDI functionality described in the Oracle Automotive Statement of Direction.  (H. Atwell at 271-72).

In spite of all of these indications that American Trim had not received what it supposedly expected to receive (i.e., a production release version of Oracle Automotive), American Trim did not cancel the contract during the Acceptance Period.  During this period,

American Trim raised no issues at all concerning the delivery or availability of Oracle Automotive.  In fact, it was several months before American Trim raised to Oracle any question about the status of Oracle Automotive.  (H. Atwell at 271-72; Stratton at 189-90; Exh. 24; Exh. 25).

There is evidence that in September 1997 American Trim <u>knew</u> that it had not received Oracle Automotive.  Dana Morgan is the Treasurer of American Trim, and the person who executed the Agreement on American Trim's behalf.  (Morgan at 9, 57).  He was Hank Atwell's direct supervisor.[10]  (Morgan at 15-16).  His testimony is that Hank Atwell informed him, in September or October of 1997, that American Trim had not received Release 11, "which is Oracle Automotive."  (Morgan at 103-04).[11]

### G.  Underline American Trim Raises Concerns With The Software, And Oracle Attempts To Address Those Concerns

Over the course of the year following the delivery, beginning in November 1997, American Trim raised concerns with Oracle, and Oracle personnel attempted to address those concerns.  It is important to note here that the issues raised in November 1997 did not mention, much less focus on, Oracle Automotive.  Indeed, it was not until early 1998 that American Trim first expressed to Oracle any concern over Oracle Automotive.  (Stratton at 189-90; Exh. 16; Exh. 18; Exh. 24; Exh. 25).

---

[10] Hank Atwell no longer works for American Trim.  (Morgan at 14).

[11] Hank Atwell, on the other hand, testified that he did not know that American Trim had not received Oracle Automotive until an Oracle consultant installed the Oracle Applications for American Trim in December 1997.  (H. Atwell at 257-58; 271-72).  (In an effort to improve its relationship with American Trim, Oracle provided the consultant and installation free of charge, although it was not required to do so under the Agreement.)  (Ciccarelli at 109-10; Stratton at 179-80).

There is substantial evidence that, in response to the concerns raised by American Trim, several Oracle employees – including Oracle Application Sales Consultant Jene Stratton and Oracle Regional Manager for Application Sales Ken Lehmann, among many others – made significant efforts to respond to and assist American Trim.  (E.g., Exh. 18; Exh. 26; Exh. 27).

Indeed, Jene Stratton was assigned to support the American Trim account in a particularized effort to make the account "referenceable" to other potential customers.  In other words, Oracle tried to develop American Trim into a reference that it could use in persuading other potential customers to choose Oracle products and services to meet their needs.  (Stratton at 163-64).  On more than one occasion, Ken Lehmann wrote in internal email that Oracle's goal was to develop American Trim as a "good reference."  (Exh. 28, Exh. 29).

Unfortunately, Oracle's efforts to assist and appease American Trim were unsuccessful.  On August 7, 1998 Hank Atwell wrote to Oracle to cancel the contract and to request a refund of the license fee, technical support fee, and training fee totaling $1,756,547.  (Exh. 30).  Although Oracle continued to make efforts to satisfy American Trim and salvage the business relationship, including an offer by Oracle to invest over $270,000 worth of Oracle consulting services to "jump start" American Trim's ERP implementation, American Trim filed the above-captioned action.  (Exh. 6).

## III.    ARGUMENT

The standard for summary judgment under Rule 56 is well known to counsel and to the Court and need not be repeated here for the sake of form.  See, e.g., Palshook v. Jarrett, 120 F.Supp.2d 641, 647-48 (N.D. Ohio 2000) (Carr, J.).  What is important to note, however, is that, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," and that summary judgment is the proper tool "by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial

with the attendant unwarranted consumption of public and private resources." Celotex Corp. v.

Catrett, 477 U.S. 317, 323-24, 327 (1986). In other words, a motion for summary judgment is a

particularly appropriate mechanism to narrow the issues to those claims that have sufficient

factual support in the record[12] to warrant trial.

---

[12] The citations to the record contained herein are citations to discovery that has been
conducted to date. Unfortunately, there remains a significant amount of discovery that was
requested for summary judgment purposes that has not been produced by American Trim.

In particular, despite numerous requests by Oracle, Plaintiff has failed to produce
important categories of documents and only recently completed a thorough search of the
documents maintained by the employees involved in the transaction at issue. On February 6,
2001, Plaintiff's counsel informed Defendant's counsel that this review was complete, and that
Plaintiff would be producing new documents obtained from that recent process. Those new
documents have not been produced. Also, corporate documents from Plaintiff's Managers'
Council and corporate counsel have not yet been produced. On Friday, February 16, 2001 (the
last business day before this motion was due to be served) the undersigned counsel received for
the first time agendas of American Trim Managers' Council meetings indicating that the choice
of Oracle was formally presented to the Managers' Council in meetings held in April and May
1997. No minutes of those meetings have been produced.

In addition to outstanding documents, at least ten depositions remain to be taken. The
depositions of at least six current and former American Trim employees and corporate
representatives who have information related to the transaction (Hank Atwell, Craig Rogers, Lori
Braun, John Hay, Colin Watkins, and David DeVita) remain outstanding. While the depositions
of Atwell, Rogers, and Braun have been already been commenced, they are not complete. An
additional four depositions of Alcoa-related witnesses are required. Two of these witnesses (Ray
Mitchell and Richard Milner) are the former Alcoa-side members of the Managers' Council who
approved the transaction. The other two are a former Alcoa employee who negotiated the
Agreement on behalf of American Trim (Bill Hogan) and a current Alcoa employee who
participated in discussions between Oracle and American Trim about American Trim's
difficulties (Jim Hopkins). Discovery regarding Alcoa's involvement in the transaction is
particularly important, as Alcoa had licensed Oracle ERP software itself, and a majority-owned
Alcoa subsidiary (Alcoa Fujikura Ltd.) licensed the CARaS software several months before
American Trim did. Alcoa has only recently communicated to the parties (through counsel) that
it will not cooperate in the discovery process in this matter. Oracle intends to exercise its right to
subpoena fact witnesses and relevant documents.

The parties are continuing to work together to complete the discovery process.
Notwithstanding the incomplete status of discovery, Oracle is serving and filing the present
motion for summary judgment pursuant to the agreed upon pretrial schedule and in an effort to

A.    **California Law Governs This Action**

Section 7.2 of the SLSA is headed **"Governing Law"** (emphasis in original), and reads as follows:

> This Agreement, and all matters arising out of or relating to this Agreement, shall be governed by the laws of the State of California.

On the basis of this clause, the law governing all of the Plaintiff's claims in this matter is California law.

A federal court sitting in diversity applies the choice-of-law principles of the forum state. Klaxon Co. v. Stentor Electric Mfg Co., 313 U.S. 487 (1941); Tele-Save Merchandising Co. v. Consumers Distributing Co., 814 F.2d 1120, 1122 (6th Cir. 1987).  When contracting parties have a choice-of-law provision in their agreement, Ohio gives effect to the principles set forth in the Restatement (Second) of Conflicts of Laws, § 187 ("Restatement").  Jarvis v. Ashland Oil, Inc., 17 Ohio St.3d 189, 478 N.E.2d 786 (1985); Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co., 6 Ohio St.3d 436, 453 N.E.2d 683 (1983); Tele-Save, 814 F.2d at 1122.

"Ohio choice of law principles strongly favor upholding the chosen law of the contracting parties."  Tele-Save, 814 F.2d at 1122.  A contractual choice-of-law provision will be applied unless the chosen state "has no substantial relationship to the parties or the transaction."  Id.[13]  The "substantial relationship" test is met if the chosen state is "where one of the parties is domiciled or has his principal place of business."  Restatement, § 187, Comment f (cited in Jarvis, 6 Ohio St.3d at 191, 478 N.E.2d at 788).  It is undisputed that the Defendant, a party to

_____

preserve the May 1, 2001 trial date established in this matter.  Based upon the evidence in the record to date, summary judgment is warranted.

[13] Under very limited circumstances, public policy grounds may also prevent application of a contractual choice-of-law provision.  Jarvis, 17 Ohio St.3d 189, 478 N.E.2d 786 (syllabus).  Those circumstances are not present in this case.

the contract, has its principal place of business in California.  (Complaint, ¶2; Answer, ¶2).
Accordingly, under Ohio law, the choice-of-law provision in the contract is to be applied.

Furthermore, the California choice-of-law provision governs not only the Plaintiff's
contract claims, but also Plaintiff's claims of misrepresentation and fraud, which are inextricably
and directly related to the Agreement.  Restatement, § 201.  See also Tele-Save, 814 F.2d 1120,
1121-23 (contractual choice of New Jersey law governs plaintiff's claims for fraud and breach of
contract, Ohio statutory claim for fraud not available to plaintiff); Banek Inc. v. Yogurt Ventures
U.S.A., Inc., 6 F.3d 357, 363 (6ᵗʰ Cir. 1993) (broad choice-of-law provision governs fraud and
misrepresentation claims, citing (among others) Tele-Save).

The counts and claims subject to summary judgment are addressed in the order presented
in the Complaint.

### B.    There Is No Evidence That Oracle Breached The Agreement

Pursuant to the Agreement, including the SLSA and the Order Form, Oracle granted
American Trim "a nonexclusive license to use the Programs specified on [the] Order Form[.]"
(SLSA, ¶2.1(A)).  The "Programs" licensed included the software listed on the Order Form and
the user guides and manuals for installation and use provided therewith.  (SLSA, ¶1.1, 1.2).  The
user guides and manuals are referred to in the Agreement as the "Documentation."  (SLSA, ¶1.2).

With regard to the performance or functionality of the software, the Agreement warrants
only that "each unmodified Program license will perform the functions described in the
Documentation."  (SLSA, ¶5.2(A)).  In the event of breach of this warranty, American Trim was
obligated to permit Oracle to attempt to correct any errors and "make the Program operate as
warranted."  (SLSA, ¶5.3(A)).  In the event the problem with a Program turned out not to be
correctable, American Trim would be entitled "to terminate the Program license and recover the
fees paid to Oracle for the Program license."  (Id.)

American Trim's breach of contract claim is not based on any claim that any of the programs licensed pursuant to the Agreement failed to perform as documented.  Rather, the Complaint alleges that Oracle breached the Agreement by "failing to deliver or render operational the software application package it agreed to supply, in particular, the Oracle Automotive software."  (Complaint, ¶46).  The only software listed on the Order Form to which this allegation could reasonably refer is the "Oracle Automotive CARaS" software.   However, American Trim has produced no evidence that the CARaS software (or any other software program licensed to American Trim) failed to perform the functions described in its Documentation.  Furthermore, there is no evidence that any of the Documentation provided with any of the programs licensed to American Trim in the fall of 1997 described the EDI integration functionality sought by American Trim.

The deposition testimony of Kelly Atwell demonstrates that there is no genuine issue regarding whether the software provided to American Trim provided the documented functionality.  She testified that American Trim I/S personnel believed that they were ready to begin implementation of the Oracle software at one of American Trim's plants shortly after the I/S team completed its Oracle training in the spring of 1998.  However, the team did not wish to implement in other plants before receiving software with the EDI integration functionality that American Trim sought.  (K. Atwell at 180-82).  The EDI integration functionality was not promised in the Documentation.  Accordingly, there is no evidence that the Agreement was breached with regard to software functionality.

American Trim's breach of contract claim is premised solely upon alleged representations that were made outside the Agreement, rather than from the failure of licensed software to function as documented in accordance with the Agreement.  The Agreement,

however, contains what is commonly referred to as an "integration clause."  Paragraph 7.9 is

headed **"Entire Agreement"** (emphasis in original), and reads in relevant part as follows:

> This Agreement constitutes the complete agreement between the parties and
> supersedes all prior or contemporaneous agreements or representations, written or
> oral, concerning the subject matter of this Agreement.  This Agreement may not
> be modified or amended except in a writing signed by a duly authorized
> representative of each party; no other act, document, usage or custom shall be
> deemed to amend or modify this Agreement.

Under California law, such an "integration clause" will be enforced.  Bionghi v.

Metropolitan Water Dist., 70 Cal. App. 4th 1358 (1999).  See also Marani v. Jackson, 183 Cal.

App.3d 695, 701 (Cal. Ct. App. 1986) ("the integrated written agreement of the parties [is] their

exclusive and binding contract no matter how persuasive the evidence of additional oral

understandings") (emphasis in original).  Evidence of representations outside the integrated

Agreement cannot form the basis for finding a breach of the Agreement.  Marani, 183 Cal. App.

3d at 701.

When a contract is integrated, external evidence regarding the meaning of contract terms

cannot be considered unless the terms themselves are ambiguous.  Bionghi, 70 Cal. App. 4th at

1364.  The Agreement is unambiguous in representing that only the software specified on the

Order Form was licensed to American Trim, and the licensed software would only provide

functionality documented in "the user guides and manuals for installation and use of the Program

software."  (SLSA ¶¶1.2, 2.1, 5.2).

Accordingly, pursuant to Celotex, Oracle submits that there is no genuine issue of

material fact with regard to American Trim's breach of contract claim (Count I), and summary

judgment is warranted on that claim.  Celotex, 477 U.S. at 323.

- 26 -

C.    **There Is No Evidence That Oracle Breached The Express Warranties Set Forth In The Agreement**

The express warranties set forth in the Agreement are described and referenced above. As described above, there is no evidence that any of the programs licensed under the Agreement failed to function as described in their Documentation.

In this portion of the Complaint, American Trim mentions only one specific piece of software that was licensed, Oracle Interoffice.  However, Oracle I/S team member Paul Pellegrini testified that, after the I/S team attended training in the spring of 1998, American Trim actually implemented Interoffice at all of its plants; Pellegrini "rolled out" Interoffice to all of the plants by the fall of 1998 and American Trim continued to use the software even after the filing of the Complaint in this matter in May of 1999.  (Pellegrini at 115-17, 182-83).

Because there is no genuine issue as to whether the software met the express warranties set forth in the Agreement, there is no genuine issue of material fact on Plaintiff's claim for breach of express warranties (Count II), and summary judgment is warranted thereon.

D.    **All Implied Warranties Were Disclaimed In The Agreement**

Section 5.2(D) of the SLSA is headed **"Disclaimers"** (emphasis in original), and provides as follows:

> **THE WARRANTIES ABOVE ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**
>
> **Oracle does not warrant that the Programs will operate in combinations other than as specified in the Documentation or that the operation of the Programs will be uninterrupted or error-free.  Pre-production releases of Programs and computer-based training products are distributed "AS IS."**

(SLSA, ¶5.2(D)) (emphasis in original).

Pursuant to § 2316 of the California Uniform Commercial Code, the parties were free to agree to this disclaimer.  Cal. U. Com. Code § 2316.  See generally, In re Mesa Business Equipment, Inc., No. 89-55825, 1991 U.S. App. LEXIS 8625 (9th Cir. April 30, 1991) (applying § 2316 to software) (copy attached).  The disclaimer unquestionably meets the requirements that it be conspicuous and that it mention merchantability.  Cal. U. Com. Code § 2316(2).

Accordingly, given the indisputable, clear, and conspicuous language of the Agreement, summary judgment is warranted on Plaintiff's claim for breach of implied warranties (Count III).

### E.  No Reasonable Juror Could Find That Oracle Intended To Defraud American Trim

Fraud requires proof of an intentional and knowing falsehood (or concealment) made with intent to deceive.  The elements of an action for fraud under California law are:

> (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.

Lazar v. Superior Court of Los Angeles County, 12 Cal. 4th 631, 638 (1996) (internal quotation marks and citations omitted).  Under California law, an action for fraudulent inducement is considered an action for "promissory fraud," which is a "subspecies of the action for fraud and deceit."  Id.  In order to recover for fraudulent inducement, a plaintiff must prove that "defendant intended to and did induce plaintiff to [enter into a contract] by making promises . . . he did not intend to (since he knew he could not) perform."  Id. (internal quotation marks and citations omitted).

American Trim appears to base its entire fraud case on alleged misstatements made at the Troy demonstration in April of 1997.  Even if American Trim's version of what occurred that day is accepted, there is still no genuine issue of fact as to whether Oracle intended to deceive American Trim about the availability of the standard EDI integration functionality described in

- 28 -

the Statement of Direction.  First and foremost, there is no evidence that Mike Vandivier, or any other Oracle sales person, knowingly made any misrepresentation with the intent to deceive American Trim.  This alone warrants summary judgment on the fraud claim.

Secondly, the negotiations between Oracle and American Trim did not begin or end with the Troy demonstration.  The undisputed facts demonstrate that Oracle made ample written disclosures regarding Oracle Automotive.  Further, American Trim had numerous opportunities to learn more about the status and availability of Oracle Automotive and the standard EDI integration functionality described in the Statement of Direction.  There is an overwhelming volume of evidence that Oracle did not conceal from American Trim the true status of Oracle Automotive, including the following:

(1)     Every page of the Statement of Direction was marked with an italicized disclaimer that the functionality described therein could not be incorporated into any contract.  (Exh. 8).

(2)     The "availability" section of the Statement of Direction made plain that Beta testing was to begin in the first quarter of 1997, and offered no commitment or projection as to the date when such testing would end and production release would be achieved.  (Exh. 8).

(3)     After the Statement of Direction was delivered to American Trim and before the Troy demonstration, American Trim I/S personnel were invited to the OAUG conference in Nashville, where they were free to seek out other Oracle customers and inquire about the experiences of other customers with regard to Oracle Automotive, or any other Oracle product.  (Exh. 10).

(4)     Prior to taking delivery of the software, American Trim I/S personnel were invited to (and attended) yet another OAUG conference (Orlando) which provided yet another opportunity to discuss Oracle products with other Oracle customers.  (Exh. 17).

(5)     The agenda for the Orlando OAUG conference in September specifically and clearly indicates that a separate break-out session entitled "Automotive Process SIG" was scheduled to discuss "the status of the Oracle Automotive solution."  The name of the presenter at that meeting, and the fact that he was an employee of an Alcoa subsidiary, were plainly disclosed on the agenda, and American Trim

- 29 -

personnel were free to attend the meeting or to contact the presenter.  (Exh. 17 at A03090).

(6)    The Orlando OAUG conference was also the occasion for the public dissemination of a press release from Oracle disclosing to all the world that it intended to make Oracle Automotive "[a]vailable with Oracle Applications Release 11 (Exh. 19)."  A concurrent press release made clear that Oracle did not plan to make Oracle Applications Release 11 available until 1998.  (Exh. 20).

(7)    It is undisputed that when American Trim took delivery it received, and knew it received, Oracle Applications Release 10.7.  (Exh. 21).  It is undisputed that in the fall of 1997, American Trim did not receive, and knew it had not received, Oracle Applications Release 11.

(8)    When the software was delivered, the only reference to "Oracle Automotive" indicated that Oracle Automotive was still a Beta product.  (Exh. 21).

(9)    The Agreement provided American Trim more than two weeks to review the documentation that accompanied the software to satisfy itself that the EDI capabilities of the software as delivered were acceptable.  (Exh. 11).

(10)    Although Hank Atwell testified that he did not have any idea before December 1997 that American Trim had not received what it expected with regard to Oracle Automotive, Mr. Atwell's direct supervisor, Dana Morgan, testified that he knew shortly after the software was delivered that it did not include Oracle Automotive. (Morgan at 103-104).

Taking the evidence in the light most favorable to American Trim, this is a case about mixed messages, not fraud.  On the one hand, assuming the truth of American Trim's allegations and version of the evidence, statements made by Mike Vandivier at the Troy demonstration may have given the impression that a standard EDI integration was available at the time of the demonstration.  On the other hand, an overwhelming volume of information available to American Trim (and to the public) disclosed that the product was still under development in 1997.

Finally, aside from the many disclosures about product availability, the undisputed testimony is that Oracle hoped and committed significant resources to develop American Trim

into a "referenceable" customer.  Such evidence is entirely inconsistent with any claimed intent to defraud.

Under these facts, American Trim cannot sustain its burden of proving that Oracle intended to deceive and defraud American Trim.  While there may be genuine issues of fact about whether American Trim received conflicting information from Oracle regarding the status and availability of Oracle Automotive, and whether reliance on such information was justified under the circumstances, such issues at best create a negligent misrepresentation case, not a fraud case.  Summary judgment on the fraud claim is warranted to narrow the issues for trial.

**F.**    **American Trim's Recoverable Damages Are Limited To The Fees Paid To Oracle**

In the Complaint and Initial Disclosure, American Trim has indicated that it intends to seek attorney fees, punitive damages, and compensatory damages in excess of the fees American Trim paid to Oracle.  Such damages are not recoverable as a matter of law, and summary judgment on this issue will narrow the presentations of the parties at trial.

**1.**    **Attorney Fees Are Not Recoverable In This Case**

Under California law, attorney fees are recoverable only under very limited circumstances.  Those circumstances do not apply in this case.[14]  Even recovery on a claim for fraud does not permit an award of attorney fees.  Gray v. Don Miller & Assocs., Inc., 35 Cal.3d 498 (1984).

---

[14] Attorney fees may be recovered under California law under the following circumstances: (1) a statute or an agreement of the parties specifically provides for recovery of attorney fees; (2) the litigation confers benefits upon others (class action/common fund cases); (3) the litigation confers a benefit on the defendant (corporate derivative actions); (4) the litigation confers benefits on a large class of persons "by effectuating a strong public policy" (the "private attorney general" doctrine); (5) the plaintiff was "required to employ counsel to prosecute or defend an action against a third party because of the tort of the defendant" (the "tort of another" doctrine).  Gray v. Don Miller & Assocs., Inc., 35 Cal. 3d 498, 504-05 (1984).

**2.  American Trim Cannot Meet The Burden For Recovering Punitive Damages**

In California, recovery of punitive damages is permitted only "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Ca. Civ. Code § 3294.  "Fraud" for purposes of punitive damages is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  Id.[15]

For the reasons stated above, no reasonable juror could find by clear and convincing evidence that Oracle has been "guilty of oppression, fraud, or malice" within the meaning of California punitive damages law.  See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255-57 (1986). (clear and convincing burden of proof is to be taken into account at summary judgment phase).  Summary judgment is warranted to exclude such recovery and narrow the presentations (and rhetoric) at trial.

**3.  The Limitation Of Liability Clause In The Agreement Is Enforceable**

Paragraph 7.5 of the SLSA is entitled **"Limitation of Liability"** (emphasis in original), and reads as follows:

> **In no event shall either party be liable for any indirect, incidental, special or consequential damages for loss of profits, revenue, data or use, incurred by either party or any third party, whether in an action in contract or tort, even if the other party has been advised of the possibility of such damages. Oracle's liability for damages hereunder shall in no event exceed the amount of fees paid by Customer under this Agreement, and if such damages result from Customer's use of the Program or services, such liability shall be limited to fees paid for the relevant Program or services giving rise to the liability.**

---

[15] Under California law, punitive damages are never available for breach of contract claims, even if the breach was willful, fraudulent, or malicious.  Myers Bldg. Indus. v. Interface Technology, Inc., 13 Cal. App. 4th 949, 959 (1993).

> The provisions of this Agreement allocate the risks between Oracle and Customer. Oracle's pricing reflects this allocation of risk and the limitation of liability specified herein.

(Emphasis in original.)

It is a long-settled rule of California law that sophisticated parties are free to allocate business risks by negotiating limitation of liability clauses covering both contract and tort (negligence) liability, and the law will enforce such clauses. <u>Delta Air Lines, Inc. v. Douglas Aircraft Company, Inc.</u>, 238 Cal. App.2d 95, 100-105 (1965).  <u>See also, e.g.</u>, <u>Markborough California, Inc. v. Superior Court of Riverside County</u>, 227 Cal. App.3d 705, <u>review denied</u> 1991 Cal. LEXIS 1940 (1991) (liability limited to $67,640 fee paid to defendant, although plaintiff incurred over $5 million in expenses to remedy problem caused by defendant's negligence, limitation of liability provision of contract was never discussed between parties, and defendant failed to disclose risks of project).

Accordingly, summary judgment is warranted to limit the compensatory damages that can be recovered by American Trim on its negligence claim in this case[16] to the amount paid to Oracle by American Trim for the relevant software program or programs.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, Oracle respectfully requests an Order from the Court entering summary judgment on Count I (breach of contract), Count II (breach of express warranties), Count III (breach of implied warranties), and Count V (fraudulent inducement), as well as limiting the damages claimed to the amount of fees paid by American Trim to Oracle.

---

[16] Naturally, the agreed limitation of liability would also be enforceable as to American Trim's contract claims (Counts I, II, and III).  This is a moot point, however, as (for the reasons stated above) those claims are subject to summary judgment in their entirety.

Respectfully submitted,

_____

Walter J. Rekstis, III (0020877)
James D. Thomas (0039424)
Harris A. Senturia (0062480)
SQUIRE, SANDERS & DEMPSEY L.L.P.
4900 Key Tower
127 Public Square
Cleveland, Ohio  44144-1304
(216) 479-8500

Of Counsel:

Dorian Daley, Esq. (CA 129049)
Oracle Corporation
500 Oracle Parkway, M/S 5op7
Redwood City, CA  94065
(650) 506-0060

Attorneys for Defendant
Oracle Corporation

## CERTIFICATE OF SERVICE

A copy of the foregoing Brief in Support of Summary Judgment was sent this _____ day of February, 2001, by overnight mail to Attorneys for Plaintiff James E. Burke, Steven C. Coffaro, E. Todd Wilkowski, Keating, Muething & Klekamp, P.L.L., 1400 Provident Tower, One East Fourth Street, Cincinnati, Ohio 45202; and by first class U.S. mail, postage prepaid, to Attorney for Plaintiff Jeffrey S. Creamer, Shumaker, Loop & Kendrick, LLP, North Courthouse Square, 1000 Jackson Street, Toledo, Ohio 43624.

_____
One of the Attorneys for Defendant
Oracle Corporation